George DelVECCHIO, Petitioner–
Appellant, Cross–Appellee,

v.

ILLINOIS DEPARTMENT OF
CORRECTIONS, Respondent–
Appellee, Cross–Appellant.

Nos. 92–2553, 92–2622.

United States Court of Appeals,
Seventh Circuit.

Argued May 5, 1993.

Decided Oct. 26, 1993.

Order Granting Rehearing En Banc and
Vacating Opinion Dec. 17, 1993.

510

Matthew F. Kennelly (argued), Margaret L. Paris, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for petitioner-appellant.

Arleen C. Anderson, Asst. Atty. Gen. (argued), Office of the Atty. Gen., Terence M. Madsen, Asst. Atty. Gen., Office of the Atty. Gen., Criminal Appeals Div., Sara Dillery Hynes (argued), Renne G. Goldfarb, Cook County State's Atty., Civil Div., Chicago, IL, for respondent-appellee.

Before CUMMINGS, RIPPLE and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

George DelVecchio[1] was convicted of slashing the throat of six-year-old Tony Canzoneri and of raping the child's mother, Karen, and sentenced to die. DelVecchio was captured on the roof of the Canzoneris' two-flat apartment when a Chicago police officer called to the scene of the rape heard snow crunching outside an attic window. DelVecchio's first words at being spotted were, "I didn't kill nobody." Later that morning—two days before Christmas 1977—police found Tony's body stuffed in a crawl space under the stairs; his trachea, carotid artery, jugular vein and vagus nerve were severed and his third and fourth cervical vertebrae were fractured. The motive of the slaying, apparently, was to allow the attacker to rape Karen Canzoneri without being interrupted. DelVecchio was convicted of murder, rape, deviate sexual assault and burglary.[2]

■ But he did not receive a fair trial. The judge had an extreme conflict of interest—as a prosecutor in an earlier case involving DelVecchio, he made critical decisions that resulted in the defendant being free, rather than in prison, at the time of Tony Canzoneri's murder, and then as judge ruled

---

1. Earlier decisions have spelled defendant's name with a space: Del Vecchio. His briefs to this Court omit the space. We will honor the spelling preferred by the defendant.

2. At the time of DelVecchio's conviction, the statutes he was charged with violating were numbered as follows: murder (Ill.Rev.Stat.1975, ch. 38, sec. 9–1(a)(2)); rape (Ill.Rev.Stat.1975, ch. 38, sec. 11–1); deviate sexual assault (Ill.Rev. Stat.1975, ch. 38, sec. 11–3); and burglary (Ill. Rev.Stat.1975, ch. 38, sec. 19–1). The jury found that there were aggravating circumstances concerning the murder and no mitigating circumstances under Ill.Rev.Stat.1975, ch. 38, sec. 9–1(b), and recommended a death sentence. The trial judge accepted the jury's recommendation.

on the admissibility of evidence about the first case—and he did not bother to tell the defense about his conflict. This, by the way, is the most benign interpretation of the judge's silence. As a result, we direct Illinois under the habeas statute, 28 U.S.C. § 2254, to grant DelVecchio a new trial or release him.

## I.

Karen Canzoneri could identify DelVecchio as her attacker because she knew him—in fact had invited him and his wife, Rose, to her house earlier in the evening of her son's murder. After Karen, Tony and a friend of Karen's, Santo Falcone, drove to Lombard, Illinois, to buy a stereo receiver, they stopped at a tavern where by happenstance they met the DelVecchios. The four adults, who knew each other, and Tony then left the bar and went to Karen Canzoneri's house where the DelVecchios and Falcone smoked marijuana that George DelVecchio brought with him in a briefcase. In the meantime, Falcone put Tony to bed downstairs. Karen Canzoneri asked her visitors to leave after an hour and they did. But George DelVecchio returned at dawn, according to Mrs. Canzoneri, this time without an invitation. He told her he wanted to talk. She felt threatened and pulled out a pistol; it would not fire and DelVecchio knocked the weapon from her hand. When she tried to leave him, DelVecchio raped her. The phone rang twice and DelVecchio left Karen Canzoneri alone and went downstairs. She looked for a phone but found that its cord had been cut, so she ran from her house across the street to her mother's and called the police. When DelVecchio was arrested crawling on the roof of the Canzoneris' home, he had in his pocket a credit card Karen Canzoneri had left on the kitchen table. The police later discovered Tony's body; the boy had been killed by a powerful blow to the neck with a knife.

DelVecchio was convicted after a jury trial and, in addition to the death sentence for Tony Canzoneri's murder, received a fifteen-year term for rape, six years for deviate sexual assault and seven years for burglary. He has been sitting on death row in Illinois now for fourteen years. The defendant exhausted his remedies in Illinois and applied to the district court for habeas relief.[3] Judge Holderman held that the state must grant DelVecchio a hearing about the voluntariness of his confession for a 1965 crime that figured prominently in these proceedings but otherwise rejected the writ. DelVecchio appeals the district court's denial of other relief and the state cross-appeals the need for a hearing about the 1965 confession. We reverse the district court's decision to deny DelVecchio a writ based on the claim that his trial was unfair because the judge was biased against him. We also affirm the district court's holding that if Illinois wants to retry DelVecchio and introduce the confession as evidence, it must provide him with a hearing about its voluntariness.

This is not the first time DelVecchio has been convicted of murder. In 1965, when he was sixteen years old, DelVecchio and two friends, high on "goof balls" according to newspaper reports at the time, shot a sixty-six-year-old man named Fred Christiansen nine or ten times as he was walking down his street, Waveland Avenue in Chicago, to pick up a pack of cigarettes. DelVecchio and his comrades netted all of $11 from Christiansen's wallet. DelVecchio confessed. The case generated an extraordinary amount of press coverage—dozens of newspaper articles—because it was one of the first incidents in Chicago in which teenagers went on what might be called a senseless drug-induced rampage to capture money for drugs. It was thus a very high-profile case when it landed in the Cook County state's attorney's office, perhaps the second-most publicized case in the four-year tenure of Louis Garippo, chief of the state's attorney's criminal division. Chief criminal prosecutor Garippo later became a Cook County judge and in that capac-

---

3. The Illinois Supreme Court cases affirming DelVecchio's conviction, in each instance over a dissent, are reported in 105 Ill.2d 414, 86 Ill.Dec. 461, 475 N.E.2d 840, certiorari denied, 474 U.S. 883, 106 S.Ct. 204, 88 L.Ed.2d 173 (1985) *("DelVecchio I")*, and 129 Ill.2d 265, 135 Ill.Dec. 816, 544 N.E.2d 312 (1989), certiorari denied, 494 U.S. 1062, 110 S.Ct. 1540, 108 L.Ed.2d 779 *("DelVecchio II")*. The district court decision is reported in 795 F.Supp. 1406 (N.D.Ill.1992). The preceding factual depiction is taken from these opinions.

ity, fourteen years after the Christiansen slaying, he presided over the capital trial of George DelVecchio for the murder of Tony Canzoneri.

Under Illinois law in 1965, any male who had yet to reach his seventeenth birthday but who was convicted and sentenced as an adult was sent to the Illinois Youth Commission ("IYC") with no minimum mandatory term. Ill.Rev.Stat. ch. 23 §§ 2523–2525 (1963).[4] The IYC then had total discretion: it could release the boy at any time before he turned twenty-one years old, it could release him when he turned twenty-one, or it could send him to an adult penitentiary at age twenty-one at which point the offender would receive a new sentence. *Id.* By contrast, any male sentenced after he turned seventeen received a normal adult term of years and served his time in a penitentiary. DelVecchio's case landed in the state's attorney's office in early February 1965; DelVecchio was set to turn seventeen on March 1, 1965 (DelVecchio was born February 29, 1948, a leap year). Prosecutors, then, had they delayed sentencing for a few weeks, could have guaranteed that DelVecchio would serve time (and almost certainly more of it) in an adult institution. Here is the choice prosecutors faced: if DelVecchio were sentenced on February 28, 1965, he would go to a youth home and be eligible to be freed the next day; if he were sentenced on March 1, 1965, he would go to an adult penitentiary and receive a *minimum* mandatory sentence of fourteen years and possibly a sentence as high as fifty years. Ill.Rev.Stat.1963, ch. 38, sec. 9–1.

DelVecchio's lawyer thought the state was intentionally delaying the indictment. He thus went to see Louis Garippo and proposed a deal: DelVecchio would plead guilty if Garippo would allow the boy to be sentenced before his seventeenth birthday. Garippo agreed. The future judge expedited DelVecchio's indictment and he was sent to the IYC rather than to a state penitentiary. Considering that DelVecchio had already admitted in writing to shooting Christiansen—thus a conviction seemed assured even without a guilty plea—Garippo gave the young man an extraordinary break by speeding up the indictment. He also left himself and the state's attorney's office open to criticism for being soft on the criminals who had perpetrated such a shocking murder.

Garippo made other key decisions in the Christiansen case. He assigned his former trial partner, James Flynn, to represent Illinois in court against DelVecchio. He decided that DelVecchio would be charged as an adult rather than as a juvenile, which put the case before the circuit court's criminal division rather than its juvenile division, where cases of offenders under age seventeen were routinely handled. Garippo received a memo about the Christiansen case and discussed the matter repeatedly with Flynn.[5] And Garippo—though apparently he did not enter an official appearance on behalf of the state—attended the court proceedings at which DelVecchio entered a guilty plea and accepted his sentence.

When DelVecchio turned twenty-one in 1969, the IYC staff unanimously recommended parole but its top officials trans-

4. Ill.Rev.Stat.1963, ch. 23 § 2525 provided in part:
1. The control by the Commission of a person committed as a delinquent shall cease when such person reaches the age of 21 years;
2. The control by the Commission of a person committed in a criminal proceeding shall cease at the expiration of the maximum term provided by law for the offense for which he was committed and he shall thereupon be discharged, but if such maximum term does not expire until after his twenty-first birthday the control and custody of the Commission over such person shall cease on his twenty-first birthday and he shall immediately become subject to the control and custody of the Department of Public Safety or if on parole of the

Parole and Pardon Board * * *. The Commission shall notify such person and the Department of Public Safety or the Parole and Pardon Board at least 60 days before the twenty-first birthday of such person, and shall hold such person subject to the order of such department or board. The Commission may enter into cooperative agreements with the Department of Public Safety and the Parole and Pardon Board to facilitate the transfer of such persons.

5. After the state successfully resisted for several years the defense's attempts in state court to secure a copy of one such memorandum written by an assistant state's attorney, Illinois was ordered by the district court to produce it. The state then claimed the memo was lost.

ferred him to an adult penitentiary for further incarceration. In 1971 he was brought before the circuit court to receive an adult sentence. With the brutal Christiansen murder having receded from public consciousness, and with such a sterling behavioral record at IYC that even the prosecutor admitted DelVecchio had done everything possible to rehabilitate himself, the judge imposed the lowest adult prison term available, fourteen years, which allowed the inmate to be paroled just two years later, in April 1973. In all, DelVecchio was incarcerated for eight years. It is likely that if Garippo had made a different decision—to delay indictment and sentencing a few weeks—DelVecchio would not have been released in 1973 and probably would have been in prison on December 22, 1977, the night of Tony Canzoneri's death. This is more than mere speculation by defense lawyers desperate for habeas relief; prosecutors made the same argument to the jury in the sentencing phase of the trial— that had DelVecchio not received such gentle treatment by officials in the Christiansen murder, Tony Canzoneri would still be alive.

Whether or not Judge Garippo felt responsible for DelVecchio's being free in late 1977, his statements suggest that as an elected judge he feels his personal reputation is at stake when he is lenient on a defendant. Garippo said in his deposition for this case that judges "get their biggest criticism" if someone they have given a break to is "caught doing something." Garippo tells any defendant he is sentencing to probation or releasing on recognizance that he is "wearing Garippo's sweat shirt and if he fowled [sic] up while he was either out on personal bond or on probation, he would get that sweat shirt dirty and it had my name on it; and then I would feel very offended if someone had Garippo's sweat shirt and dirtied that sweat shirt" (Garippo dep. of August ·16, 1991, at 32).

The Christiansen killing did not merely lurk in the background of DelVecchio's trial for the murder of Tony Canzoneri; it became the locus of a series of hotly contested evidentiary rulings by Judge Garippo. Before trial DelVecchio's counsel, who intended to mount an insanity defense, made motions *in limine* to exclude use of the 1965 Christiansen conviction and confession for three reasons: they were irrelevant to the 1977 murder; the 1965 confession had been involuntary and taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and the state's attorney's office improperly bypassed the circuit court juvenile division to indict DelVecchio as an adult. Judge Garippo delayed any decision on these issues until he heard the evidence, but he did not tell the defense of his role in the Christiansen case. In particular, he did not tell the defense that he was personally responsible for the decision to bypass the juvenile division that was now being challenged as improper. Well into the trial, Garippo decided that he would permit prosecutors to use the Christiansen confession and conviction against DelVecchio unless the defendant withdrew his claim of insanity. Having delayed his ruling until much of the evidence had been presented, Judge Garippo forced DelVecchio's lawyers to choose between letting the jury hear the damning evidence from 1965 or abandoning the insanity defense. They chose to drop the insanity defense. Judge Garippo told jurors that "something" had happened to shorten the trial, and he permitted prosecutors to argue in closing that the defendant "threw in the towel" on the insanity defense because "it was not working." Judge Garippo then allowed the state to use the 1965 murder in the sentencing phase of the trial. Prosecutors argued to the jury that "experts" had fouled up once by giving DelVecchio a break as a teen-age killer, and that he should not receive a second chance in the form of a prison sentence rather than capital punishment lest experts err again:

> Well, you can see that if George DelVecchio from 1965 had served even the minimum from that sentence, fourteen years, Tony Canzoneri would be alive today and looking forward to Thanksgiving tomorrow. The so-called experts have said, let George DelVecchio out after serving eight years in custody, various juvenile facilities and then the Illinois State Penitentiary. They decided George DelVecchio had been rehabilitated. Those decisions from those

so-called experts cost Tony Canzoneri his life.

*DelVecchio I,* 105 Ill.2d 414, 435–436, 86 Ill. Dec. 461, 475 N.E.2d 840. Prosecutors obviously did not realize as they made this argument that Judge Garippo was one of the supposed experts who had given DelVecchio a break in the 1965 case.

According to DelVecchio, he did not learn that Judge Garippo had any significant role in prosecuting him in the Christiansen murder until 1986, seven years after the trial in the Canzoneri case. By that point his death sentence had been affirmed on direct appeal. See *id.* The state resisted attempts to discover more information, but Garippo submitted an affidavit that said his personal involvement was "limited to two tasks": assigning the case to his former law partner Flynn and agreeing to expedite the filing of charges so that DelVecchio could plead guilty as a juvenile. A state court judge denied DelVecchio's request for more discovery and the state Supreme Court affirmed, *DelVecchio II,* 129 Ill.2d 265, 278, 135 Ill.Dec. 816, 544 N.E.2d 312, stating that Garippo's role was minor. Not until Judge Holderman in the district court ordered that Judge Garippo be deposed did his full involvement in the 1965 case became known to the defense.

## II.

We are authorized to grant a writ of habeas corpus if a person is being held under a state court judgment in violation of the Constitution of the United States. 28 U.S.C. § 2254; *Williams v. Chrans,* 945 F.2d 926, 931 (7th Cir.1991), certiorari denied, —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). We review the district court's findings of fact under a clearly erroneous standard, *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), although we must reverse if there are genuine issues of material fact construed in the light most favorable to the defendant. *Richardson v. Penfold,* 839 F.2d 392, 394 (7th Cir.1988). Of course we subject the district court's findings of law and mixed findings of law and fact to *de novo* review. *Brewer v. Aiken,* 935 F.2d 850, 855 (7th Cir.1991).

One of the most basic values of our constitutional system is that the judge who hears a case must be personally disinterested in the outcome. The central formulation of the principle was enunciated in *Tumey v. Ohio:* "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law." 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). While not every issue of judicial qualification involves constitutional validity, *id.* at 523, 47 S.Ct. at 441, and mere general allegations in a civil case of bias and prejudice are insufficient to offend due process, *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986), "it certainly violates the 14th Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441. The Court in *Tumey* omitted the obvious corollary, but we stress it here because this is a death penalty case: it violates a defendant's due process rights to subject his life, as well as his liberty and property, to the judgment of a court in which the judge is not neutral or fair. Suggestions of judicial impropriety always receive our highest attention because they undermine respect for law. But particularly in a capital case where the consequences of error are so grave, a court must be especially vigilant that the defendant received a fair trial. "Because the death penalty is qualitatively and morally different from any other penalty, '[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, the consequence of scrupulously fair procedures.'" *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2530, 120 L.Ed.2d 269 (1992) (Stevens, J., concurring) (quoting *Smith v. Murray,* 477 U.S. 527, 545–546, 106 S.Ct. 2661, 2672, 91 L.Ed.2d 434 (1986) (Stevens, J., dissenting)).

We have not considered whether a criminal defendant must, to prove a due process violation, show that the judge in his case was actually biased against him, or whether it is sufficient that the judge merely appeared to be prejudiced against him. The district court speculated, based on our decisions in *Margoles v. Johns,* 660 F.2d 291 (1981), certiorari denied, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982), and *Walberg v. Israel,* 766 F.2d 1071, certiorari denied, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), and two cases from the Sixth Circuit, *Corbett v. Bordenkircher,* 615 F.2d 722, certiorari denied, 449 U.S. 853, 101 S.Ct. 146, 66 L.Ed.2d 66 (1980), and *Jenkins v. Bordenkircher,* 611 F.2d 162 (1979), certiorari denied, 446 U.S. 943, 100 S.Ct. 2169, 64 L.Ed.2d 798 (1980), that we would require actual bias. But *Margoles* was a civil case—moreover, a civil case where the allegations of judicial conflict were utterly unpersuasive: a judge had been Wisconsin's attorney general years before when the plaintiff was involved in a dispute with the state's medical examining board on a matter unrelated to the subsequent litigation. And in *Walberg* we did not have to decide whether actual bias is required in the criminal context because in that case the judge's blatant hostility toward the defendant's lawyer deprived the accused of effective assistance of counsel. 766 F.2d at 1077. As for the decisions from the Sixth Circuit, which of course are not binding here, these merely declined to establish a *per se* rule that any former involvement by a prosecutor-turned-judge in an unrelated case against the defendant violates the Constitution. *Corbett,* 615 F.2d at 724; *Jenkins,* 611 F.2d at 166.

■ Not only are these cases beside the point, but the Supreme Court has repeatedly answered this very question by noting that the appearance of justice is as important as the reality of justice, or at least important enough that its absence violates due process. In *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), the Court held in a criminal case that a defendant should not be tried by the same judge who appeared prejudiced against him in an initial trial. After quoting *Tumey v. Ohio,* the Court said, "In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's [judge's] part, but also whether there was 'such likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" *Id.* at 501, 94 S.Ct. at 2704 (quoting *Ungar v. Sarafite,* 376 U.S. 575, 588, 84 S.Ct. 841, 849, 11 L.Ed.2d 921. (1964)). And in *In re Murchison,* the Court said:

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. * * * Such a stringent rule [as set out in *Tumey* ] may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). There is also a practical reason to demand that judges recuse themselves whenever there is an appearance of impropriety: proving actual bias is frequently impossible. Of course judges have personal feelings about the cases they try; one cannot expect and should not desire a lack of humanity. But since even a judge with the strongest distaste for a defendant is hardly likely to blurt out, "I am out to get you," the only practical way to demonstrate partiality or conflict is by circumstance and inference. To require a criminal defendant to prove actual bias would ensure that no one could ever succeed in showing that their Fourteenth Amendment rights have been transgressed by a partial judge.[6]

---

6. The difficulty is illustrated by the dissent's treatment of DelVecchio's claims. Disputing the inference of actual bias that might be drawn from one of Judge Garippo's statements to DelVecchio's counsel, Judge Manion asks, "If Judge Garippo was trying to railroad DelVecchio, why would he tell DelVecchio's lawyer?" (dissent at 528). Under Judge Manion's approach, the de-

The potential conflict need not be financial. Although *Tumey* referred to pecuniary interests by the judge, 273 U.S. at 523, 47 S.Ct. at 441, the Supreme Court in *In re Murchison* held that a judge cannot both take a case before a grand jury and then sit in judgment of it because "[h]aving been a part of that process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." 349 U.S. at 137, 75 S.Ct. at 625–626. No financial interest was present in *Murchison* or in *Bloom v. Illinois*, 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 (1968), where the bias emanated from personal insults hurled by the defendant that struck "at the most vulnerable and human qualities of a judge's temperament." See also *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (mayor could not sit as judge of municipal violations). In deciding these cases, the Court merely recognized that human motivations often turn on matters in addition to money. We would not, for example, allow a judge to try a defendant accused of murdering the judge's husband. Nor would a judge be permitted to try a defendant when the judge had won election by pointing to the individual accused as an example of someone who should be executed—even if, by some miracle of science, we were able to enter the judge's head to discover that she had not prejudged the case.

The dissent, however, would enunciate a new standard under which the appearance of impropriety would be acceptable so long as there was not " 'some [actual] incentive to find one way or the other' or 'a real possibility of bias' * * * " (dissent at 521). We do not disagree that the incentive to be biased or the real possibility of bias may be important considerations in determining whether there is an appearance of prejudice. But there is little in Supreme Court precedent to suggest that the appearance of prejudice is limited to these circumstances. Having an incentive to be biased and the possibility of using that bias to injure a defendant are really just variants of the idea that judges must not appear partial. To the extent that

these notions are evident in the case law, they merely reflect the concern that the appearance of partiality, to constitute a due process violation, must not be trivial. And Garippo's conflict was in no sense trivial. In fact, Judge Garippo's actions in the Canzoneri case were so egregious that even if proof of actual bias were required, we would still hold that the judge's conflict of interest violated the defendant's due process rights.

By acting as George DelVecchio's trial judge after serving as criminal division chief during the Christiansen murder proceedings, Judge Garippo violated the basic principle of judicial neutrality in two respects. First and most egregious, he was forced to sit in judgment of his own decisions as a prosecutor. It is simply inexcusable for the judge to have considered a motion to strike the 1965 conviction on the grounds that DelVecchio should have been tried as a juvenile when Garippo himself decided that he would be prosecuted as an adult. Moreover, the validity of the 1965 confession and conviction was one of the pivotal issues in the Canzoneri case, in part because Judge Garippo forced DelVecchio's lawyers to abandon the insanity defense under threat that the Christiansen murder would otherwise come into evidence.

The second way Judge Garippo violated judicial neutrality was by hearing a case against a defendant about whom it would have been natural for the judge to hold a grudge. Arguably, Judge Garippo bore some personal responsibility for the fact that DelVecchio was not incarcerated at the time of Tony Canzoneri's death—as noted, prosecutors made just such an argument to the jury in closing when they said that "experts" in the Christiansen case badly misjudged the accused. Perhaps the judge did not feel biased against DelVecchio and did not allow personal sentiment to infect his judgment at the trial. But we have at least circumstantial evidence that Garippo was predisposed against DelVecchio based on his deposition testimony that he feels personally betrayed when a defendant on whom he has been lenient commits another crime. More specif-

---

fendant could never win. If the judge is silent there is no proof of actual bias. And if the judge does say things that sound partial, there is still

no evidence of bias because if the judge were really partial, he would have been smart enough to remain silent.

ically, the record contains an affidavit from a court employee who said that the files from the Christiansen murder case had been signed out to Judge Garippo's courtroom clerk before the trial in the Canzoneri slaying started and thus before the judge had any reason to examine the old files. The judge also went out of his way to opine that DelVecchio was more deserving of the death penalty than John Wayne Gacy, who was convicted in Garippo's court of committing thirty-three murders and who also received a death sentence. Even disregarding this substantial evidence that Garippo took an unusual personal interest in DelVecchio's case, the judge was still obliged to recuse himself if from the vantage of the defendant, a rational person accused of a crime could not be convinced that he received a fair trial under these circumstances. *Walberg*, 766 F.2d at 1077. According to the dissent, Judge Garippo was not biased against DelVecchio because he had no financial interest in the case, had not been insulted by the defendant or his attorneys, and did not serve in the dual roles of judge and prosecutor. With all respect, this is simply wrong. Garippo prosecuted DelVecchio and then had occasion to revisit his decisions as a judge. That Garippo's dual roles were enacted in separate proceedings hardly negates the fact that Garippo was passing judgment on his own decisions as a prosecutor. And though DelVecchio may not have insulted the judge in the courtroom as in *Bloom*, 391 U.S. at 202, 88 S.Ct. at 1482, Garippo revealed in his deposition that he feels personally insulted and betrayed when a defendant he has favored with lenient treatment goes awry and "dirtie[s] * * * Garippo's sweat shirt" (Garippo deposition of Aug. 16, 1991, at 32).

We emphasize that this is not simply a matter of a judge having been a non-partici-

pating member of a prosecutor's office trying an unrelated case against the defendant. Nor is this the case of an office supervisor handling hundreds of routine matters and making only ministerial judgments. This judge was the central decision maker in the 1965 prosecution against DelVecchio. Had he been the attorney of record for Illinois, the conflict might be more obvious but it would not be any more substantial. *United States v. Ziegenhagen*, 890 F.2d 937, 941 (7th Cir.1989) (former prosecutor had conflict of interest even though he was not attorney of record). In fact, had the defendant sought out Louis Garippo to act as his trial counsel in the Canzoneri slaying, he would have been obliged to decline because of his earlier dealings with DelVecchio as a prosecutor. *Id.* at 940–941. We can expect no less from judges.[7]

Finally, Judge Garippo exacerbated the conflict by not telling counsel for the defense or prosecution about it at trial or after. The most charitable assessment of this omission is that perhaps the judge did not recall or realize the significance of the conflict. Yet between the judge's silence and the state's lengthy efforts to resist discovery, the defense was kept in the dark for nearly fifteen years. This silence deprived DelVecchio of the opportunity to seek Judge Garippo's recusal at trial, caused undue delay, wasted judicial resources, prejudiced DelVecchio by forcing him to raise the matter on habeas rather than on direct appeal, and now it requires us to set aside the jury's verdict in its entirety.

### III.

We must address one last issue. DelVecchio both confessed and pled guilty to the

---

7. The dissent analogizes Judge Garippo's conduct to that of various Supreme Court justices who heard cases after writing extensively in the same field. These things are not comparable. We do not expect judges to come to the bench without views on public controversies that may come before them in one form or another. But there is a fundamental difference between having expressed views on an abstract matter of law and having prejudged an individual defendant in a criminal case. This is the difference between the general and the specific. Many judges, for exam-

ple, are former prosecutors with set notions about the criminal law; these judges need not recuse themselves from every criminal case. However, we certainly expect them to recuse themselves where they have prosecuted a particular defendant. In *Laird v. Tatum*, 409 U.S. 824, 828, 93 S.Ct. 7, 10, 34 L.Ed.2d 50 (1972), Chief Justice Rehnquist expressed his approval of disqualification of a judge "if he actively participated in any case even though he did not sign a pleading or brief."

1965 murder of Fred Christiansen. He does not now claim that his guilty plea was involuntary, but he challenges the validity of the confession. The question is whether, having pled guilty to killing Christiansen, DelVecchio waived whatever rights he might have had to challenge the voluntariness of the confession. Judge Garippo refused to grant DelVecchio a hearing before allowing the state to use the confession as evidence in aggravation in DelVecchio's sentencing for the Canzoneri murder. The Illinois Supreme Court summarily affirmed. *DelVecchio I*, 105 Ill.2d at 432–433, 86 Ill.Dec. 461, 475 N.E.2d 840. The district court, however, agreed with DelVecchio that there must be a hearing to explore the voluntariness of the confession before it can be used to enhance his sentence for another murder. Obviously, our granting of the habeas writ extinguishes the death sentence and with it whatever error Judge Garippo might have made in allowing the jury to hear evidence of the confession. But in the interests of judicial economy—should the state retry DelVecchio, prosecutors are certain to try to introduce the Christiansen confession to enhance whatever sentence he may receive, even in a noncapital case—we note our agreement with the district court.

◾ Uncounseled convictions cannot be used against a person to support a guilty verdict or to enhance punishment for another offense. *Burgett v. Texas*, 389 U.S. 109, 115, 88 S.Ct. 258, 262, 19 L.Ed.2d 319 (1967). Illinois posits two arguments why DelVecchio has lost the right to challenge the 1965 confession, both of which hinge on the same misunderstanding. Under *Ford v. Georgia*, a state may erect a so-called procedural bar based on a "firmly established and regularly followed state practice" and thus keep defendants from raising certain constitutional issues on collateral appeal. 498 U.S. 411, 423–424, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–351, 104 S.Ct. 1830, 1835–1837, 80 L.Ed.2d 346 (1984)). But the practice must be regularly followed; it cannot have been "manufactured for the occasion" of preventing this defendant the right to appeal. *Prihoda v. McCaughtry*, 910 F.2d 1379, 1384 (7th Cir.1990). Here an Illinois procedural

rule prevents defendants who have pled guilty from challenging the constitutionality of their confessions in those cases. *People v. Brown*, 41 Ill.2d 503, 505, 244 N.E.2d 159 (1969). Illinois thus argues that DelVecchio lost his right to contest his 1965 confession when he swore in state court that he had murdered Fred Christiansen. The flaw in the state's reasoning is that DelVecchio is not now attacking his 1965 confession for purposes of overturning the 1965 conviction; he is merely challenging use of the confession to enhance his sentence for the murder of Tony Canzoneri. Even the state admits the issue is novel: "[T]here are no Illinois cases in which a defendant has attacked a conviction in an earlier case in which he pleaded guilty, when that conviction was later used by the government in a subsequent case for purposes of aggravation at sentencing" (state's brief at 9). If the issue has never come up before, as Illinois concedes, then there cannot be a well-established and regularly applied procedural bar to prevent DelVecchio's claims.

◾ Illinois also argues that DelVecchio may not relitigate the voluntariness of his confession under the rule in *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process." But again, DelVecchio is not now attacking his 1965 confession for the purpose of claiming that his guilty plea in the Christiansen murder was in any way improperly obtained. In *Haring v. Prosise*, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983), a state similarly argued that a defendant who had pled guilty could not bring a § 1983 claim based on an allegedly illegal search and seizure. The Court held that a guilty plea did not cut off constitutional challenges to everything that came before, only constitutional challenges to the conviction itself. As the Court said,

> Our decisions in *Tollett* and the cases that followed simply recognized that when a defendant is convicted pursuant to his guilty plea rather than a trial, the validity of that conviction cannot be affected by an

alleged Fourth Amendment violation because the conviction does not rest in any way on evidence that may have been improperly seized. * * * Therefore, the conclusion that a Fourth Amendment claim ordinarily may not be raised in a habeas proceeding following a plea of guilty does not rest on any notion of waiver, but rests on the simple fact that the claim is irrelevant to the constitutional validity of the conviction.

*Id.* at 321, 103 S.Ct. at 2377. Although DelVecchio's claim is not based on the Fourth Amendment, and he is not seeking monetary damages in a § 1983 action, the same reasoning applies. If anything, DelVecchio's argument that his 1965 guilty plea did not extinguish his right to challenge his 1965 confession in a 1977 murder case is stronger than the defendant's claim in *Haring*. Here the state is attempting to use the 1965 confession in a proceeding entirely unrelated to the case in which DelVecchio pled guilty, unlike *Haring* where the § 1983 action grew out of the same crime as the guilty plea. And DelVecchio is challenging the voluntariness of his confession under the Fifth Amendment, a claim that raises even more weighty issues about the reliability of a conviction than an illegal search and seizure, the subject of the claim in *Haring*. See *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). As in *Haring*, a defendant's decision to plead guilty simply does not convey sufficient information to conclude that the confession was not coerced or that the evidence against him was not seized illegally. In this instance, for example, DelVecchio's guilty plea was very likely motivated by a simple desire to take advantage of prosecutor Garippo's willingness to allow him to be sentenced before he turned seventeen years old. The state points to a recent Supreme Court decision, *Parke v. Raley*, —— U.S. ——, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992), holding that a presumption of regularity attaches to final judgments. But again, DelVecchio is not challenging the final judgment in the Christiansen murder.

Finally, we agree with Judge Holderman that this error was not harmless and that the state must prove that DelVecchio's 1965 confession was voluntary, rather than DelVecchio having to prove that the confession was involuntary. The 1965 evidence played a pivotal role in DelVecchio's sentencing for the Canzoneri murder; if the confession on which much of the evidence was based was gained by coercion, the error can in no sense be considered harmless. And the state must bear the burden of proof because, with DelVecchio having pled guilty at trial, the state never had to prove by a preponderance of the evidence as it must in a criminal trial that the confession was voluntary. *Martin v. Wainwright*, 770 F.2d 918, 925 (11th Cir.1985), certiorari denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

The district court's holding concerning the 1965 confession is affirmed. Its holding regarding Judge Garippo's failure to recuse himself is reversed and Illinois is directed to grant DelVecchio a new trial or release him.[8]

MANION, Circuit Judge, dissenting.

Judge Garippo's participation at DelVecchio's trial did not deny DelVecchio a fair trial. I also disagree with the court that before Illinois can use DelVecchio's confession against him, the state must prove at a hearing that the confession was voluntary. Therefore, I respectfully dissent.

## I.

George DelVecchio comes before us having twice been convicted of murder. In 1965, during the course of a two-day crime spree, DelVecchio, then sixteen years old, pumped at least nine bullets into Fred Christiansen, an elderly man who had the misfortune of being alone in the same area where DelVecchio and two companions were looking for somebody to rob. DelVecchio fired several of the shots into Christiansen while an accomplice was kicking the dying man in an attempt to silence his cries for help. After

8. Other issues raised by the defendant need not be resolved here because the conflict of interest issue is dispositive. However, our failure to consider these questions does not imply that they are without merit.

finally silencing Christiansen, DelVecchio and his compatriots made off with Christiansen's wallet, which contained $11. DelVecchio confessed to killing Christiansen and pleaded guilty to the murder.

Twelve years later, DelVecchio broke into the apartment of Karen Canzoneri, apparently for the purpose of raping her. While in her apartment and before the rape, DelVecchio slit the throat of her six-year old son, Tony. This court's opinion graphically describes the damage DelVecchio's knife did to Tony; to put it more simply, DelVecchio nearly decapitated the boy.

At his trial for Tony's murder, DelVecchio was represented by competent counsel and had full opportunity to confront the witnesses against him. He did not contest the fact that he killed Tony; his defense, instead, was that he was too intoxicated by drugs to have formed the intent to commit murder. A jury heard all the evidence and found DelVecchio guilty beyond a reasonable doubt of murder, burglary, and deviate sexual conduct, and at a separate hearing sentenced him to death. The Illinois Supreme Court twice has upheld DelVecchio's conviction and sentence. See *People v. DelVecchio*, 105 Ill.2d 414, 86 Ill. Dec. 461, 475 N.E.2d 840 (1985) (direct appeal); *People v. DelVecchio*, 129 Ill.2d 265, 135 Ill.Dec. 816, 544 N.E.2d 312 (1989) (appeal from denial of post-conviction relief).

Yet, the court holds today that DelVecchio's conviction and sentence must be set aside because DelVecchio did not receive a fair trial. This is so, says the court, because Judge Garippo, who presided at the Canzoneri trial in 1979, had been involved in DelVecchio's prosecution in 1965. Judge Garippo was not the prosecutor of record in the Christiansen case. But Judge Garippo was chief of the criminal division of the Chicago State's Attorney's Office, and in 1965 he made the decisions to try DelVecchio as an adult rather than a juvenile and to expedite DelVecchio's indictment so that DelVecchio could plead guilty and be sentenced before his seventeenth birthday. Judge Garippo also assigned his former trial partner in the State's Attorney's office to the Christiansen case and attended DelVecchio's guilty plea hearing in 1965 as a spectator.

The court holds that Judge Garippo's participation in the Christiansen prosecution violated due process in two ways. *First,* the court holds that any finding of actual bias or prejudice is unnecessary. Instead, as I understand the court's opinion, Judge Garippo's participation in the Christiansen prosecution created what the court characterizes as an "extreme conflict of interest" and presented him with a temptation to be biased against DelVecchio; this temptation, in turn, made it appear improper for Judge Garippo to preside at the trial. The court concludes that because of this appearance, Judge Garippo was required to disqualify himself from the Canzoneri case. His failure to do so violated DelVecchio's right to due process, even if Judge Garippo was scrupulously fair in conducting the trial. Second, the court holds that even if a showing of actual bias is required, Judge Garippo's participation in the Canzoneri trial violated due process.

I disagree with the court's conclusions. An appearance of bias is not a sufficient ground to require disqualification of a judge absent an actual, substantial incentive to be biased. Judge Garippo's participation in the Christiansen prosecution was not a sufficiently substantial biasing influence to require Judge Garippo's disqualification in the Canzoneri trial. Nor is the evidence in this case sufficient to show that Judge Garippo was actually biased against DelVecchio.

Certainly the appearance of justice is important in our system and the due process clause sometimes requires a judge to recuse himself from a case without a showing of actual bias, where a sufficient motive to be biased exists. A long line of Supreme Court cases compel these general conclusions. In *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927), the Court stated that "[e]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." Where such temptations exist, the due process clause "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending par-

ties.... [T]o perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986).

The court's presentation of the facts surrounding Judge Garippo's contacts with DelVecchio succeeds in leaving the impression that Judge Garippo had some "temptation" to be biased and that it did not look good for Judge Garippo to preside at DelVecchio's trial. Indeed, given that it is possible to paint the facts in as bad a light as the court has done here, it probably would have been prudent for Judge Garippo to have disqualified himself from presiding at DelVecchio's trial. But the question in this case is not about my notion of prudence or whether any judge on this panel would have disqualified himself if faced with the circumstances Judge Garippo faced. See *Whitacre v. Davey,* 890 F.2d 1168, 1171 (D.C.Cir.1989). The question, rather, is whether Judge Garippo denied DelVecchio a fair trial simply by presiding at DelVecchio's trial.

Despite the Supreme Court's broad pronouncements about "the appearance of justice" and "possible temptations," we cannot answer the fair trial question simply by concluding that it looked bad for Judge Garippo to preside at trial. If the question truly is whether a defendant received a fair trial, bad appearances alone should not require disqualification to prevent an unfair trial. What may appear bad to an observer, especially in hindsight, may not have influenced—or, more importantly, may not have had any real possibility to influence—the judge in his decision-making process. Suppose a judge does not know a close relative has a financial interest in a case he tries. To the outside observer aware of the interest but unaware of the judge's lack of knowledge, it would look bad for the judge to try that case. But if the judge does not even know about the relative's financial interest, how could he be tempted to throw the case? And if no actual incentive exists for the judge to be biased—if the judge does not have reason to be partial—how could the judge's presiding over

the trial deprive a party of his right to a fair trial before an impartial judge? See *Bradshaw v. McCotter,* 796 F.2d 100, 101–03 (5th Cir.1986) (Gee, J., concurring.).

Bad appearances alone do not require disqualification. Reality controls over uninformed perception. This court cites no case in which the Supreme Court has overturned a verdict on due process grounds based on a mere appearance of bias. Our court was correct in holding that "a litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality." *Margoles v. Johns,* 660 F.2d 291, 296 (7th Cir.1981). When the Supreme Court talks about the "appearance of bias," it is not saying that bad appearances alone require disqualification; rather, it is saying that when a judge is faced with circumstances that present "some [actual] incentive to find one way or the other" or "a real possibility of bias," a court need not examine whether the judge actually was biased. *Id.* at 297 (quoting *Howell v. Jones,* 516 F.2d 53, 57–58 (5th Cir.1975)); *Bradshaw,* 796 F.2d at 102 (Gee, J., concurring). Absent the incentive for bias, however, disqualification is not required despite bad appearance.

Moreover, while it might be fair to say that Judge Garippo faced some "possible temptation" to be biased against DelVecchio, not every "possible temptation" to be biased presents a sufficient possibility of bias to require disqualification. This is evident from other language in the same cases in which the court talks about "possible temptations." Thus, in *Aetna* and *Tumey,* the Court noted that " '[n]ot all questions of judicial qualification ... involve constitutional validity.... [M]atters of kinship, personal bias, state policy, remoteness of interest, would generally be matters of legislative discretion' "—even though any of these matters, particularly kinship and personal bias, could offer a "possible temptation" to be biased. *Aetna,* 475 U.S. at 820, 106 S.Ct. at 1584; *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441. At some point, a " 'biasing influence ... will be too remote and insubstantial to violate the constitutional constraints.' " *Aetna,* 475 U.S. at 826, 106 S.Ct. at 1588 (quoting *Marshall v. Jerrico,* 446

U.S. 238, 243, 100 S.Ct. 1610, 1614, 64 L.Ed.2d 182 (1980)).

This merely recognizes, at least implicitly, that in the real world, "possible temptations" to be biased abound. Judges are human; like all humans, their outlooks are shaped by their lives' experiences. It would be unrealistic to suppose that judges do not bring to the bench those experiences and the attendant biases they may create. A person could find something in the background of most judges which in many cases would lead that person to conclude that the judge has a "possible temptation" to be biased. But not all temptations are created equal. We expect—even demand—that judges rise above these potential biasing influences, and in most cases we presume judges do. Compare *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), in which the Supreme Court held that the contention that the combination of investigative and adjudicatory functions necessarily disqualifies an administrative adjudicator "must overcome a presumption of honesty and integrity in those serving as adjudicators."

The common law recognized this reality. At the time the American court system was established, the common law of disqualification "was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else." John P. Frank, *Disqualification of Judges,* 56 Yale L.J. 605, 609 (1947). No other interest would suffice to require, or even permit, a judge to disqualify himself, including evidence of bias against a litigant. *Id.* at 611–12; see also *Aetna,* 475 U.S. at 820, 106 S.Ct. at 1585. As Blackstone put it, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 W. Blackstone, Commentaries *361 (quoted in *Aetna,* 475 U.S. at 820, 106 S.Ct. at 1585).

As the common law recognized, and as experience teaches, the lure of lucre is a particularly strong motivation, and therefore judges ought to be prohibited from presiding over cases in whose outcomes they have a direct financial interest. Of course, the Supreme Court has held the due process clause requires disqualification for interests besides pecuniary interests. But the constitutional standard the Supreme Court has applied in determining when disqualification is necessary recognizes the same reality the common law recognized: judges are subject to a myriad of biasing influences, judges for the most part are presumptively capable of overcoming those influences and rendering evenhanded justice, and only a strong, direct interest in the outcome of a case is sufficient to overcome that presumption of evenhandedness.

The Supreme Court's disqualification cases illustrate this point. The cases requiring disqualification all involved "direct, personal [and] substantial" influences on the judges involved. *Aetna,* 475 U.S. at 822, 106 S.Ct. at 1585. In each of these cases, it is fair to say that the influences involved struck at the heart of human motivation, that an average man would find it difficult, if not impossible, to set the influence aside.

In both *Tumey* and *Aetna,* for example, judges were faced with "direct, personal, substantial, pecuniary interest[s]." See *Aetna,* 475 U.S. at 824, 106 S.Ct. at 1586. In *Tumey,* the judge in a criminal case was paid only if the defendant was convicted. 273 U.S. at 520, 47 S.Ct. at 440. In *Aetna,* Justice Embry of the Alabama Supreme Court cast the deciding vote and wrote the majority opinion in a case establishing a legal proposition that "had the clear and immediate effect of enhancing both the legal status and settlement value" of two pending cases Justice Embry had filed as a plaintiff. 475 U.S. at 822–824, 106 S.Ct. at 1585–1587.

The judge in *Ward v. City of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), faced a temptation similar to those faced by the judges in *Tumey* and *Aetna.* In *Ward,* the Court held that the mayor of Monroeville could not sit as a judge in traffic court. The mayor was responsible for the town's finances and revenue production; Monroeville derived a "major part" of its income from fines and other costs imposed in that court. The Court sensibly held that the mayor's responsibility for town finances "may make him partisan to maintain the high level of contribution from the mayor's court."

*Id.* at 60, 93 S.Ct. at 83. That interest, like the judge's personal financial interest in *Tumey,* provided the mayor sufficient incentive to find against the defendant that the mayor could not, consistently with the due process clause, sit as judge. See *id.*

The Court has also required disqualification in the face of a litigant's direct personal insults to a judge. In *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), the defendant during the course of his trial called the judge, among other epithets, a "dirty [S.O.B.]," a "dirty tyrannical old dog," a "stumbling dog," and a "fool," had charged the judge with running a "Spanish Inquisition," and had told the judge to "Go to hell." *Id.* at 466, 91 S.Ct. at 505. The Court held that the judge could not subsequently try the litigant for contempt in the face of this abuse. The litigant's insults were "apt to strike 'at the most vulnerable and human qualities of a judge's temperament.'" *Id.* (quoting *Bloom v. Illinois,* 391 U.S. 194, 204, 88 S.Ct. 1477, 1483, 20 L.Ed.2d 522 (1968)). See also *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (judge who had become embroiled in a "running controversy" with an attorney that resulted in "marked personal feelings ... on both sides," and during which the judge had displayed an "unfavorable personal attitude" toward the attorney, could not try the attorney for contempt).

In *In re Murchison,* the Court held that the combination of prosecutorial and adjudicatory functions in that case violated due process. In *Murchison,* a state court judge acted as a "one-man grand jury" investigating police corruption. Two witnesses before the judge in his role as grand juror answered questions in such a way as to convince the judge that those witnesses had committed contempt. The judge charged the two witnesses with contempt and subsequently tried and convicted them. 349 U.S. at 134–135, 75 S.Ct. at 624–625. The Supreme Court held that the trial before the same judge who brought the contempt charges violated the defendants' right to due process. "Having been part of [the accusatory process] a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.* at 137, 75 S.Ct. at 625–626.

But a comparison of the situations in which the Court required disqualification with situations in which the Court did not find disqualification was required makes it clear that not all "possible temptations" toward bias require a judge to disqualify himself. For example, in *Aetna,* the Court held that Justice Embry's general antipathy toward and frustration with insurance companies did not require him to disqualify himself. 475 U.S. at 820–21, 106 S.Ct. at 1584–1585. "[O]nly in the most extreme of cases" would the Constitution require disqualification for this type of general bias. *Id.* at 821, 106 S.Ct. at 1585.

Likewise, not all contemptuous conduct by a person prevents a judge from trying the person for contempt. The Court refused to hold a judge disqualified from trying a witness for contempt in *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), despite the witness' continued criticism of the judge, disobedience to his orders during trial, and "disruptive, recalcitrant and disagreeable commentary." *Id.* at 584, 84 S.Ct. at 847. One might suppose this disobedience and criticism offered a "possible temptation" to be biased against the defendant. But the judge had not become "personally embroiled" with the litigant, and the Court refused to "assume that judges are so irascible that they cannot fairly deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Id.*

The line between interests that require disqualification and those that do not is not always clear. Consider the contrast between *Murchison* and *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), a case involving similar circumstances. In *Withrow,* the Wisconsin Medical Examining Board commenced an investigation to determine whether a doctor had committed certain illegal acts. The Board subsequently decided to hold a hearing to determine whether the doctor had committed the alleged illegal acts and whether to suspend the doctor's license temporarily. 421 U.S. at 39–41, 95 S.Ct. at 1460–1461. The Supreme Court held that the Board could adjudicate the

same charges it had investigated and decided to prosecute without violating the doctor's due process rights. See *id.* at 47–55, 95 S.Ct. at 1464–1468.

One may wonder why the Court found a due process violation in *Murchison* but not *Withrow*. In both cases, the same person (or body) had served as both prosecutor and adjudicator. In both cases, the adjudicators seemed to have had a "possible temptation ... not to hold the balance nice, clear, and true...." But the Court distinguished *Withrow* from *Murchison;* the procedure in *Murchison* violated due process "not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on 'his own personal knowledge and impression of what had occurred in the grand jury room' an impression that 'could not be tested by adequate cross-examination.'" 421 U.S. at 53, 95 S.Ct. at 1467 (quoting *Murchison,* 349 U.S. at 138, 75 S.Ct. at 626).

Not even all financial interests are disqualifying. In *Aetna,* for instance, six other judges were members of the plaintiff class in the two suits Justice Embry had filed. Although those six justices conceivably had a "slight pecuniary interest" in the outcome— and, therefore, a "possible temptation" to be biased—the Court held that their disqualification was not required. 475 U.S. at 825– 826, 106 S.Ct. at 1587–1588. The justices' interests, though pecuniary, were not "direct, personal, and substantial...." *Id.* Any gain to these justices from a favorable decision in *Aetna* was "speculative and contingent;" the class had not yet been certified, and no class relief had been awarded. *Id.*

The Court's cases require that we go beyond generalizations about "possible temptations" in deciding whether Judge Garippo was required to disqualify himself. The question is not whether some possible temptation to be biased exists; instead, the question is, when does a biasing influence require disqualification absent a showing of actual bias? Consistent with the common law, we begin in answering this question by presuming "the honesty and integrity of those serving as adjudicators." *Withrow,* 421 U.S. at

47, 95 S.Ct. at 1464; *Dyas v. Lockhart,* 705 F.2d 993, 997 (8th Cir.1983). Disqualification is required only when the biasing influence is strong enough to overcome that presumption, that is, when the influence is so strong that we may presume actual bias. See *Dyas,* 705 F.2d at 996–97. This occurs in "situations ... in which experience teaches that the possibility of actual bias is too high to be constitutionally tolerable." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. A court must be convinced that a particular influence, "under a realistic appraisal of psychological tendencies and human weakness," poses "such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.*

Judged by this standard, Judge Garippo was not required to disqualify himself unless he was actually biased against DelVecchio. Judge Garippo faced none of the biasing influences involved in the cases in which the Supreme Court required disqualification. Judge Garippo had no financial interest— direct or indirect—in the outcome of DelVecchio's trial. He had never been subject to any personally insulting, abusive, or even disrespectful remarks by DelVecchio or his attorneys. He did not serve the dual role of prosecutor and judge in the Canzoneri trial.

Judge Garippo had been involved in some aspects of DelVecchio's prosecution for murder in 1965—fourteen years before the Canzoneri trial. But as both the Fifth and Sixth Circuits have held, no per se rule disqualifies a judge because he has prosecuted a defendant in the past. *Corbett v. Bordenkircher,* 615 F.2d 722, 723–24 (6th Cir.1980); *Murphy v. Beto,* 416 F.2d 98, 100 (5th Cir.1969). This rule is consistent with the Supreme Court's cases. Prosecuting a defendant in one case is not the kind of action from which we can presume bias or prejudgment in a future case.

The court finds grounds for Garippo's disqualification not in the mere fact that he was involved in the prosecution of DelVecchio in 1965, but rather in the intersection of the 1965 and 1979 cases. Specifically, despite the overall aura of impropriety the court attempts to create from Judge Garippo's involvement in the 1965 prosecution, the court at bottom finds that the due process clause required Judge Garippo to recuse himself for

two reasons: first, because Judge Garippo in 1979 "was forced to sit in judgment of his own decisions as a prosecutor" in 1965; and second, because "it would have been natural" for Judge Garippo "to hold a grudge" against DelVecchio because Judge Garippo had given DelVecchio a break in 1965 by allowing him to be sentenced as a juvenile rather than as an adult. Neither of these perceived influences is sufficient to require Judge Garippo to disqualify himself from the Canzoneri trial absent actual bias.

DelVecchio did file motions to exclude use of his 1965 confession and conviction in the Canzoneri trial, and Judge Garippo did have to rule on these motions. But as the Court in *Murchison* stated, the interest necessary to disqualify a judge "cannot be defined with precision. Circumstances and relationships must be considered". 349 U.S. at 136, 75 S.Ct. at 625. The circumstances in this case—the actual contents of the motions and the issues they raised—do not warrant a finding that Judge Garippo was so likely to have prejudged the motions' merits that we can presume he could not impartially decide the motions.

DelVecchio challenged the use of his 1965 conviction at the 1979 trial because the conviction was irrelevant to the issues at the 1979 trial. In another motion, DelVecchio also alleged that his 1965 conviction was illegal because the statute that allowed juveniles to be charged as adults violated due process in two ways: the statute did not require a hearing to determine if a juvenile should be charged as an adult; and the statute left the decision to charge a juvenile as an adult to the "absolute and totally standardless discretion" of the State's Attorney and circuit court judge. Finally, DelVecchio challenged the use of his 1965 confession in the 1979 trial because the confession was involuntary and obtained in violation of *Miranda*.

The court would have us presume that Judge Garippo was unable to consider these motions impartially. But certainly there is no reason to think, let alone presume, that Judge Garippo could not impartially consider the relevance of the 1965 conviction. That question in no way required Judge Garippo to judge any decision he had made in 1965. Judge Garippo had no personal stake in finding the 1965 conviction relevant.

Nor did Judge Garippo have any real personal stake in the decisions of the other motions. The court finds it "inexcusable" for Judge Garippo to have considered DelVecchio's motion challenging the constitutionality of the law in 1965 allowing juveniles to be charged as adults. It is true that Judge Garippo made the decision to charge DelVecchio as an adult (a decision that Judge Garippo in his 1989 deposition described as a "no-brainer"—16-year olds accused of murder were almost always charged as adults). But DelVecchio's motion did not focus on Judge Garippo's decision; it focused on the statute under which he made that decision. The motion did not allege that Judge Garippo himself violated the Constitution except to the extent that he followed the allegedly unconstitutional statute. There is no reason to presume that a judge in Judge Garippo's position could not impartially decide DelVecchio's motion, unless perhaps he had some professional or intellectual stake in the statute's constitutionality. But the record reveals no such stake. There is no indication, for example, that Judge Garippo had anything to do with drafting or passing the statute, or that he had ever defended the statute's constitutionality. The motion in no way required Judge Garippo to "judge his own decision as a prosecutor."

Neither did DelVecchio's motion regarding the admissibility of his confessions require Judge Garippo in any real sense to "judge his own decision." Judge Garippo was at best only tangentially involved in taking DelVecchio's confession. DelVecchio gave two confessions, one to police and one to Assistant State's Attorney Patrick Tuite, Judge Garippo's subordinate. Judge Garippo read Tuite's report about the confession. But Judge Garippo himself took no confession from DelVecchio. In fact, Judge Garippo's deposition indicates that he first read about the crime in the newspaper and did not even know of the case when the police and Tuite took DelVecchio's confessions. The motion does not allege, nor does the record indicate, that Judge Garippo improperly trained his subordinates, or that he required or allowed subordinates to extract involuntary confessions from suspects, either systematically or in this case. Again, any personal stake

Judge Garippo would have had in upholding the confession was minimal. There is no reason to presume that Judge Garippo could not impartially evaluate the work of the police or his former subordinate.

Our decision in *Barry v. United States,* 528 F.2d 1094 (7th Cir.1976), is instructive on whether DelVecchio's pretrial motions required Judge Garippo to disqualify himself. In *Barry,* the defendant was indicted under a then-novel (but subsequently upheld) construction of the Hobbs Act. Barry's trial judge had been a United States Attorney. As United States Attorney, the judge had personally decided to use the Hobbs Act to prosecute activity such as that Barry was involved in. *Id.* at 1097. One of the questions the judge had to decide at trial was whether the Hobbs Act applied to Barry's activities. *Id.* at 1100.

The judge in *Barry* had at least as much professional and intellectual stake in the outcome of the Hobbs Act question as Judge Garippo had in the outcomes of DelVecchio's motions to exclude his 1965 conviction and confession. He himself had made the decision to apply the Hobbs Act the way it was applied in Barry's case. But after examining Supreme Court precedent and the practices of Supreme Court justices in deciding whether to disqualify themselves, this court held that the judge's interest was insufficient to require disqualification under the due process clause. See *id.* at 1099–1100 & 1100 n. 19.

As *Barry* indicates, Supreme Court disqualification practice is also instructive. Justice Black, *Murchison's* author, was one of the principal authors of the Fair Labor Standards Act and helped shepherd the Act through Congress. Yet, Justice Black sat in *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), the case deciding the Act's constitutionality. Justice Black's is not an isolated case. For example, Justice Frankfurter, as a law professor, had written extensively in the field of labor law and had co-authored a book, *The Labor Injunction,* that had severely criticized the use of injunctions against labor unions. Justice Frankfurter had also played an important part in drafting the Norris–LaGuardia Act, an act designed to correct what was considered the abusive use of injunctions by federal courts in labor disputes. Yet, Justice Frankfurter not only sat in, but wrote the opinion in *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), a leading case interpreting the Act's scope. See *Laird v. Tatum,* 409 U.S. 824, 831–832, 93 S.Ct. 7, 11–12, 34 L.Ed.2d 50 (1972) (memorandum of Justice Rehnquist). Justice Jackson participated in *McGrath v. Kristensen,* 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950), a case raising the same issue he had decided as Attorney General. *Laird,* 409 U.S. at 833, 93 S.Ct. at 13. And on the Supreme Court, Justice Holmes sat in several cases reviewing decisions by the Supreme Judicial Court of Massachusetts that he had participated in. See *Laird,* 409 U.S. at 836, 93 S.Ct. at 14 (citing cases).

While the practices of Supreme Court justices regarding disqualification may not be dispositive, they are persuasive. Certainly, it would be presumptuous for us to hold that some of the most distinguished jurists in our nation's history regularly violated the Constitution by sitting in cases in which we ourselves might conclude that disqualification is prudent. Even in the light cast by the court, any interest Judge Garippo had in the outcome of DelVecchio's motions seems to be no greater than—and probably less than—the interests of Justice Black in *Darby,* Justice Frankfurther in *Hutcheson,* Justice Jackson in *McGrath,* or Justice Holmes in any of the cases in which he sat on review from the Massachusetts Supreme Judicial Court. The stake those Justices had in the outcomes of those cases was much more than that of a judge who merely "expressed views on an abstract matter of law." (Op. at 517 n. 7) All these Justices had a real professional and intellectual stake in the decisions in those cases, the type of stake that Judge Garippo supposedly should have had in the outcome of DelVecchio's motions. Yet *they* decided they could put that stake aside and rule fairly. There is no reason to presume that Judge Garippo was not likewise able to put aside the minimal interest he might have had in the decision of DelVecchio's motions.

The court's second reason for holding that Judge Garippo was required to disqualify himself is also insufficient. The court states

that it would have been "natural" for Judge Garippo to have held a "grudge" against DelVecchio. This is so, the court posits, because Judge Garippo "arguably bore some personal responsibility" for DelVecchio being on the street in 1977 because Judge Garippo agreed to expedite DelVecchio's 1965 indictment so that DelVecchio could be sentenced as a juvenile. This arguably resulted in a lesser sentence than DelVecchio otherwise might have received. The upshot of all this appears to be that Judge Garippo might have felt so guilty about letting DelVecchio off easy in 1965 that he would have been predisposed against DelVecchio in 1979.

This excuse for reversing is pure conjecture. Any biasing influence involved here is far too remote to require Judge Garippo to have disqualified himself. Judge Garippo's decision to expedite the indictment might have made it a bit more likely that DelVecchio would receive a shorter sentence than he otherwise would have received. But even when DelVecchio was sentenced as an adult when he reached age 21, a judge in the circuit court apparently gave him a break by sentencing him to only fourteen years, which with good time credits left him with only two or three years to serve. The judge based his decision in large part on DelVecchio's exemplary prison record, a record Garippo could not have foreseen in 1965. And even if DelVecchio had been sentenced as an adult in 1965, a lenient judge in the Circuit Court might just as well have decided to give DelVecchio a break. While this requires speculation, we do know that Judge Garippo had nothing to do with sentencing DelVecchio; once Garippo made the decision to expedite DelVecchio's indictment, DelVecchio's sentence was out of his hands. There was no way in 1965 for Judge Garippo to have known how long a sentence DelVecchio was likely to receive. It is highly unlikely that Judge Garippo would have felt sufficiently guilty about a decision he had so little to do with that he could not have put this guilt aside at DelVecchio's trial. The due process standard for disqualification requires an influence or interest which we can conclusively presume would cause the average judge to be biased. It is most unreasonable to presume the average judge would weigh the scales against a defendant to whom he indirectly gave a break fourteen years earlier.

But even if Judge Garippo had undoubtedly given DelVecchio a clear break—for example, if Judge Garippo had agreed to imposition of the minimum sentence in exchange for a guilty plea—the risk of bias is still insufficient to hold that Judge Garippo was required to disqualify himself. Compare a prosecutor to a sentencing judge. In a system of indeterminate sentencing, such as the federal system before the Sentencing Guidelines, judges make thousands of decisions on sentence length, based in large part on the judges' personal evaluations of the defendants before them. Any one of those decisions could turn out to be wrong. But does a judge's incorrect decision to give a defendant a sentencing break in one case necessarily prevent the judge from presiding at that defendant's trial in a case fourteen years later? Would the Circuit Court judge who actually gave DelVecchio the minimum sentence have been required to disqualify himself from the 1979 trial? Can we presume that the average judge in this situation would violate his oath to be impartial? Most trial judges would rightly reject that suggestion. To suggest partiality in such situations is inconsistent with the "presumption of honesty and integrity of those serving as adjudicators." *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464.

The court attempts to buttress its analysis by pointing to what it considers to be "circumstantial evidence that Garippo was predisposed against DelVecchio...." (Op. at 516). In fact, the court holds that "Judge Garippo's actions in the *Canzoneri* case were so egregious that even if proof of actual bias were required, we would still hold that the judge's conflict of interest violated the defendant's due process rights." But the evidence of actual bias the court musters is hardly sufficient to prove actual bias.

The court points to Garippo's deposition testimony that he feels personally betrayed by defendants who commit crimes after he has been lenient with them. But most sentencing judges probably feel this; it is a natural emotion, though hardly a disqualifying interest. Taken to its logical conclusion,

this "predisposition" theory would prevent a trial judge from trying and sentencing someone a second time. Judge Garippo's general antipathy toward defendants who abuse his lenience is akin to Justice Embry's general antipathy toward insurance companies that the Supreme Court found to be insufficient to disqualify the justice in *Aetna*.

The court points to two other pieces of circumstantial evidence. The court notes that Judge Garippo's courtroom clerk had checked out the Christiansen case files before the Canzoneri trial started "and thus before the judge had any reason to examine the old files." The implication is that Judge Garippo took an unusual interest in DelVecchio's case, and that this unusual interest points to bias. But this is like saying that an appellate judge who checks out a record before oral argument has "no reason" to examine the record, and therefore is taking an "unusual" interest in that case. In fact, the judge has a very good reason to examine the record—that reason is called preparation. Trial preparation does not start at the beginning of trial. In any event, this "evidence" shows not so much bias as curiosity; and curiosity about an earlier case is not sufficient reason for us to presume—or even infer—bias on the part of the average judge.

Finally, the court notes Judge Garippo's statement that "DelVecchio was more deserving of the death penalty than John Wayne Gacy." (Op. at 517) But the court's rendition of Judge Garippo's words mischaracterizes his actual statement and takes the statement out of context. Judge Garippo made an off-the-record comment to DelVecchio's attorney comparing three death penalty cases before him, including DelVecchio's and Gacy's. According to Judge Garippo, the statement was directed not at which of the three defendants was most worthy of death, but rather at which defendant was a more likely "candidate" for the death sentence—that is, which defendant was most likely to be sentenced to death—based on Judge Garippo's knowledge of the facts of these cases.

Judge Garippo's explanation makes sense. If Judge Garippo was trying to railroad DelVecchio, why would he tell DelVecchio's lawyer? In any event, DelVecchio has not presented any evidence inconsistent with Judge Garippo's testimony. In an affidavit, DelVecchio's trial attorney stated only that Judge Garippo "indicated his ranking of the cases with respect to their relative merits as death cases. . . . Garippo indicated that of the three defendants, DelVecchio in his view was the most appropriate candidate for imposition of the death penalty. He referred to Gacy as a 'distant third.' " The affidavit does not state that Judge Garippo said DelVecchio was more "deserving" of the death penalty than Gacy. In context, then, Judge Garippo's statement about Gacy provides no evidence of any predisposition on Judge Garippo's part.

In sum, DelVecchio has given us no reason to presume that the average judge in Judge Garippo's position would have been biased against DelVecchio. Therefore, Judge Garippo was not required to disqualify himself unless he actually was biased against DelVecchio. Although the court does hold that Garippo actually was biased, the "circumstantial evidence" of bias the majority points to is not sufficient to prove actual bias. If that evidence is sufficient even to raise an inference that Judge Garippo was biased (and I believe it was not), DelVecchio is entitled at most to a remand for an evidentiary hearing on the subject, since the question on appeal is whether summary judgment is appropriate in this case. But there is no need for a remand. DelVecchio does not argue that Judge Garippo actually was biased against him; instead, DelVecchio pinned his hopes on his argument that Judge Garippo should have disqualified himself because of the appearance of bias resulting from the alleged biasing influences that Judge Garippo faced. Because that argument fails, DelVecchio's conviction should remain intact.

## II.

I also disagree that DelVecchio was entitled to a hearing to determine the voluntariness of his 1965 confessions. The question here is whether Illinois violated the Constitution by not allowing DelVecchio to challenge his 1965 confessions in 1979 when he bypassed the opportunity to challenge those confessions in 1965. In *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908

(1964), the Supreme Court held that when a defendant challenges a confession as involuntary, due process requires that the state hold a hearing to determine the confession's voluntariness. But *Jackson* does not answer the question before us. In *Jackson,* the defendant did not pass up an opportunity to challenge his confession before challenging it years later in another case. Unlike in this case, the defendant in *Jackson* challenged his confession in the case in which the confession was given.

Neither does *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983), a case the court cites to support its holding that DelVecchio is entitled to a hearing, answer the question before us. In *Haring,* the Supreme Court held that a guilty plea does not bar a convicted defendant from filing a § 1983 action to challenge the constitutionality of an illegal search in the case in which he pleaded guilty. To reach this conclusion, the Court had to grapple with two issues. The first was whether 28 U.S.C. § 1738, which requires that federal courts give full faith and credit to state court judgments, barred the plaintiff's § 1983 action. This depended on whether the law of issue preclusion in Virginia—the state in whose courts the defendant pleaded guilty—barred the plaintiff's § 1983 action. 462 U.S. at 313–317, 103 S.Ct. at 2373–2375. The Court held that § 1738 did not bar the plaintiff's action because Virginia's law did not bar the action. *Id.* at 317, 103 S.Ct. at 2375. The second issue in *Haring* was whether the Court should "create a special rule of preclusion which nevertheless would bar litigation of his § 1983 claim." *Id.* The Court decided not to create such a special rule.

Unlike in *Haring,* the question is not whether Illinois law would bar DelVecchio from challenging his confessions in his 1979 case because of his 1965 guilty plea and his failure to challenge those confessions in 1965. The Illinois Supreme Court has already held that Illinois law does bar such a challenge. Nor do we have to decide whether to create a federal rule of claim preclusion. Instead, the question before us is whether Illinois is constitutionally required to give DelVecchio a second opportunity to challenge his confes-

sions. *Haring* does not answer this question because *Haring* did not purport to create a constitutional rule prohibiting the type of bar Illinois applied.

So the question remains: was Illinois required to give DelVecchio a second chance to challenge his confession? I think not. Illinois has a strong interest in seeing that legal issues based on factual circumstances, such as the voluntariness of a confession, are litigated as quickly as possible. As time passes, memories dim, witnesses die or become otherwise unavailable, and physical evidence deteriorates or is destroyed. Early litigation is thus more likely to ferret out the truth than litigation delayed by many years.

DelVecchio, it is true, has a significant interest in seeing that an involuntary confession is not used against him. But DelVecchio had that same interest in 1965 and had ample opportunity to challenge his confessions. In spite of his interest in attacking his confessions, DelVecchio made a reasoned decision—a decision that worked to his immediate advantage—to plead guilty and forego challenging his confessions. While it is true that we cannot presume DelVecchio's plea was motivated by a decision that he could not win at a suppression hearing, see *Haring,* 462 U.S. at 318, 103 S.Ct. at 2375, the fact remains that DelVecchio did—for a very good reason—pass up the opportunity to challenge his confessions.

And that is not all DelVecchio did. Through his attorney, DelVecchio stated that he had no objection to the state's introducing his confessions to establish the factual basis for his plea. DelVecchio's attorney used portions of his confessions (specifically, the references to DelVecchio's drug use on the night of the Christiansen murder) in arguing to the judge regarding DelVecchio's possible sentence. DelVecchio may now regret those decisions, but he does not allege that his attorney's performance in 1965 was deficient. Yet, DelVecchio demands a hearing many years after the fact to determine if his confessions were voluntary. But requiring DelVecchio to live with the decisions he made in 1965 does not violate the Constitution. Nothing in the Constitution, or in any cases

interpreting the Constitution cited by Del-Vecchio or the court, requires a state to accept a confession when it benefits the accused but (much) later defend that same confession when the accused concludes that the benefit is gone. In the vernacular, the Constitution does not allow the accused to eat his cake and still have it.

Even if DelVecchio is entitled to a hearing, I disagree that the state must bear the burden of proving that DelVecchio's confession was voluntary. The due process clause requires only that states use procedures that are not fundamentally unfair, not procedures that are most likely to produce favorable results for defendants. See *Parke v. Raley*, —— U.S. ——, ——, 113 S.Ct. 517, 524, 121 L.Ed.2d 391 (1992); *Medina v. California*, —— U.S. ——, ——, 112 S.Ct. 2572, 2580, 120 L.Ed.2d 353 (1992). Given the state's interests in quickly deciding involuntary confession claims, the difficulties that arise from delaying a decision of those claims, and the opportunity for an early decision that Del-Vecchio passed up, it is not fundamentally unfair for Illinois at this late date to require DelVecchio to prove that his confession was involuntary.

### III.

As the court notes, DelVecchio raises several other claims on appeal, all of which the district court rejected. Like the court, I will forego comment on those claims, other than to say I generally agree with the district court's disposition of those issues. I would affirm all of the district court's decision except its decision that DelVecchio is entitled to a hearing at which the state must prove that DelVecchio's 1965 confessions were voluntary, and I would deny DelVecchio's petition for habeas corpus.

Before: POSNER, Chief Judge, CUMMINGS, BAUER, CUDAHY, COFFEY, EASTERBROOK, RIPPLE, MANION, KANNE, and ILANA DIAMOND ROVNER, Circuit Judges.

### ORDER

Dec. 17, 1993.

On consideration of the petition for rehearing with suggestion for rehearing *en banc* filed by respondent-appellee, cross-appellant on November 9, 1993, the answer of petition-

er-appellant, cross-appellee, and the reply of respondent-appellee, cross-appellant, a vote of the active members of the Court was requested* and a majority of the judges in active service have voted to rehear this case *en banc.*

IT IS ORDERED that rehearing *en banc* be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED that the opinion entered in this case on October 26, 1993, be, and is hereby, VACATED. This case will be reheard *en banc* at the convenience of the Court.

---

* Judge Joel M. Flaum took no part in the consideration of the suggestion for rehearing *en banc.*